CIVIL ACTION NO. 10-83-DLB-EBA

ASHLAND HOSPITAL CORPORATION                                    PLAINTIFF
d/b/a KING'S DAUGHTERS MEDICAL
CENTER

v.

INTERNATIONAL BROTHERHOOD OF                                    DEFENDANTS
ELECTRICAL WORKERS LOCAL 575, ET AL.

AND

CIVIL ACTION NO. 10-131-DLB-EBA

ASHLAND HOSPITAL CORPORATION                                    PLAINTIFF
d/b/a KING'S DAUGHTERS MEDICAL
CENTER

v.

SERVICE EMPLOYEES INTERNATIONAL                                 DEFENDANT
UNION DISTRICT 1199 WV/KY/OH

* * * * * * * * * * * * * * *

## MEMORANDUM OPINION AND ORDER

Plaintiff Ashland Hospital Corporation d/b/a King's Daughters Medical Center (KDMC) commenced two separate actions against different defendants alleging almost identical causes of action. Against International Brotherhood of Electrical Workers Local 575 (IBEW) and Austin Keyser, KDMC asserts a "harassment" count citing the Communications Decency Act of 1996 (CDA), 47 U.S.C. § 223 *et seq.*, and KRS 525.080, a violation of the Telephone Consumer Protection Act of 1991 (TCPA), 47 U.S.C. § 227 *et seq.*, and a state law claim for tortious interference with contractual and prospective

contractual relations. KDMC filed suit approximately five months later against Service Employees International Union District 1199 WV/KY/OH (SEIU) alleging the exact same causes of action, except that it premised its harassment claim only on the CDA without citing KRS 525.080. Although these two cases are before the Court at different procedural postures, the relevant facts in both largely overlap. Therefore, the Court addresses both cases in a singular memorandum opinion.

The matter is before the Court on Defendants IBEW and Austin Keyser's (together the "IBEW Defendants") Motion for Summary Judgment (Doc. # 40) filed in Ashland Civil 10-cv-83 and on Defendant SEIU's Motion to Dismiss (Doc. # 6) filed in Ashland Civil 10-cv-131. The motions have been briefed (IBEW Docs. # 40, 42, 43), (SEIU Docs. # 6, 7), and oral argument in both cases was held on July 12, 2011. Mitchell Hall and Christina Hajjar appeared on behalf of Plaintiff. Joseph D'Angelo appeared on behalf of the IBEW Defendants and Don Meade appeared on behalf of SEIU. The matter is now ripe for review. For the reasons set forth below, because Plaintiff fails to state a federal claim under either the TCPA or CDA and because this Court, in its discretion, declines jurisdiction over Plaintiff's remaining state law claims the IBEW Defendants motion for summary judgment (Doc. # 40) and SEIU's motion to dismiss (Doc. # 6) are **granted**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### KDMC v. IBEW

KDMC is a non-profit corporation that owns and operates a full-service medical center in Boyd County, Kentucky, including a hospital facility in Ashland, Kentucky. The IBEW is a labor union located in Portsmouth, Ohio, that represents electricians living in Southern Ohio and Northern Kentucky. KDMC planned to construct a new hospital facility

in Portsmouth and the IBEW learned from KDMC's Vice President, Howard Harrison, that the hospital planned to use an out-of-town contractor, Reddy Electric, to build its facility. Reddy Electric is located in Xenia, Ohio, and does not employ members from the IBEW. In fact, the IBEW claims Reddy Electric has an ongoing history of wage and labor violations. To dissuade KDMC from retaining Reddy Electric, in early 2010 Austin Keyser—the IBEW's business manager and principal officer—presented KDMC's CEO Fred Jackson with information detailing Reddy Electric's allegedly unfair labor practices. Notwithstanding this information, KDMC retained Reddy Electric to perform its electrical work for the upcoming Portsmouth project.

In response, the IBEW initially decided to "forge a broad grass-roots community based coalition to amplify its message" that KDMC should hire locally. (Doc. # 40 at 3). In June 2010, the IBEW authorized Keyser to form a 501(c)(4) non-profit corporation called the Community Reinvestment Agency of Ohio ("CRAO") to carry out this purpose. Keyser was the sole incorporator of CRAO and the union paid for CRAO's incorporation. On June 21, 2010, Keyser, acting on behalf of CRAO, sent an email to Jackson again urging him to hire locally. The email outlined the planned campaign to "expose the truth about KDMC," which would include erecting a billboard on U.S. 23 and U.S. 52 in Portsmouth, creating handbills for dissemination, creating a website, and hosting yard sales explaining KDMC's refusal to hire locally. Keyser's email further explained "[w]e will also be running weekly robocalls to the tens of thousands of residents in Southern Ohio and Northern Kentucky to highlight the many reasons we feel KDMC is bad for our community." (Doc. # 40-4, Ex. 2). Keyser asserts that CRAO did not take any further action against KDMC after this email was sent. In his assessment, the organization "never got off the ground." (Doc. # 40-3 at

3

14). Despite this hitch in the IBEW's plan to urge KDMC to reinvest in local workers, the union itself pressed forward with the plans that CRAO was created to execute.

The IBEW launched a robocall campaign against KDMC beginning in June 2010 continuing through the first week of July. The IBEW contracted out to Ohio AFL-CIO Communications, Inc. to conduct the robocall campaign. Ohio AFL-CIO is a Columbus-based nonprofit organization that provides resources, expertise, and networking opportunities for labor organizations. It would use prerecorded messages provided by the union to institute the robocalls. Keyser and the members of his staff developed the script for recording onto Ohio AFL-CIO's robocall equipment, which read:

> Hello, my name is Kelly and I am confused by King's Daughters Medical Center and the choices they are making here in Scioto County. King's Daughters' CEO Fred Jackson has received bids from several contractors, including one that will put local people to work. Sadly, for the price of a few medical procedures, it appears that KDMC CEO Fred Jackson is going to bring in out-of-town companies and workers to build their new facility. Southern Ohio Medical Center has always committed to using local businesses and local workers, so how can we support a hospital that won't make the same commitment? Please press 1 now to leave a message for Fred Jackson, who received more than $1,150,000 in yearly compensation, and ask him why he would expect you to spend our hard-earned dollars at King's Daughters while he spends his out of town. Thank you.

(Doc. #40-4, Ex. 5).

If the robocall system failed to connect to a live answer, it would leave a message at the recipient's residence. Calls were allegedly made to residents of Southern Ohio and Northern Kentucky who could then choose whether to connect to Fred Jackson or Howard Harrison at KDMC. Thousands of the Ohio and Kentucky residents contacted opted to connect directly to KDMC in the months of June and July 2010. KDMC alleges that this activity "tied up multiple incoming telephone lines at KDMC's hospital facility" in violation of 47 U.S.C. § 227(b)(1)(D). (Compl. ¶¶ 8, 10, 17).

The purported goal of the robocall campaign was to "truthfully inform the public of the Union's concerns about KDMC and to mobilize KDMC's prospective customer base to action to persuade KDMC to reconsider its planned use of Reddy Electric." (Doc. # 40 at 4-5). The IBEW terminated its robocall campaign, however, when it learned that KDMC temporarily halted construction of the new Portsmouth facility. To the parties' knowledge, the Portsmouth project has not resumed construction.

After a brief period of discovery, the IBEW Defendants filed the pending motion for summary judgment premised on federal labor law preemption. (Doc. # 40).

**KDMC v. SEIU**

Approximately five months after initiating suit against the IBEW, KDMC filed suit against SEIU on December 29, 2010. SEIU is an Ohio union that represents thousands of health care and social service workers across the state. Some of SEIU's members are KDMC employees.

Albeit for different reasons, SEIU launched a similar robocall campaign against KDMC in December 2010, which allegedly continued through the filing of the Complaint on December 29, 2010.[1] The robocall campaign in this case, operated in an identical fashion to the one launched by the IBEW: individual residents were contacted in the communities KDMC services and a prerecorded message would prompt individuals to press a number on the keypad to connect to CEO Fred Jackson. KDMC's call logs indicate that all of these calls originated from a single telephone number out of Columbus, Ohio. Between mid-morning on December 28, 2010 and late afternoon on December 29, 2010, 536 calls were

_____

[1]SEIU's counsel represented at oral argument that its robocall campaign was instituted to air grievances concerning the rising healthcare costs of KDMC employees.

placed to Jackson's extension at KDMC.  KDMC alleges that these calls  tied up "multiple incoming telephone lines at KDMC's hospital facility, including telephone lines that support calls to all numbers and extensions within KDMC, including emergency services and other medical departments, patient rooms, security, and administration."  (Doc. # 1 at ¶ 14).

To date, no discovery has been conducted and, although KDMC asserts identical claims in this action, Defendant moved to dismiss on 12(b)(1) grounds for lack of jurisdiction and 12(b)(6) grounds for failure to state a claim.  (Doc. # 6).

## II. ANALYSIS

### A.    Standard of Review

#### 1.    Motion to Dismiss

SEIU has moved for dismissal under Federal Rule of Civil Procedure 12(b)(1) and (6).  The Court, however, considers the 12(b)(1) argument first as its Rule 12(b)(6) argument becomes moot if the Court lacks subject matter jurisdiction.  *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990) (citing *Bell v. Hood*, 327 U.S. 678, 682 (1946) for the proposition that a "motion to dismiss for failure to state a cause of action may be decided only after establishing subject matter jurisdiction, since determination of the validity of the claim is, in itself, an exercise of jurisdiction.")).

A defendant is entitled to assert lack of subject matter jurisdiction as an affirmative defense in a timely filed motion to dismiss.  Rule 12(b)(1); *Mich. S. R.R. Co. v. Branch & St. Joseph Cntys. Rail Users Ass'n, Inc.*, 287 F.3d 568, 573 (6th Cir. 2002).  "Where subject matter jurisdiction is challenged pursuant to 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion."  *Id.* (citing *Moir*, 895 F.2d at 269).  In

particular, a plaintiff must establish that the complaint alleges a claim under federal law, and that claim must not be frivolous. *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1248 n.1 (6th Cir. 1996).

Under a Rule 12(b)(6) motion to dismiss, by contrast, the Court's job is to test the sufficiency of the complaint. Federal Rule of Civil Procedure 8(a) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus,* 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In reviewing a Rule 12(b)(6) motion, this Court "must construe the complaint in a light most favorable to the plaintiff, and accept all of [the] factual allegations as true. When an allegation is capable of more than one inference, it must be construed in the plaintiff's favor." *Block v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998) (citations omitted). The Court, however, is not bound to accept as true unwarranted factual inferences, *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987), or legal conclusions unsupported by well-pleaded facts. *Teagardener v. Republic-Franklin Inc. Pension Plan*, 909 F.2d 947, 950 (6th Cir. 1990).

To survive a motion to dismiss, the complaint "does not need detailed factual allegations," *Twombly*, 550 U.S. at 555, but it must present "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. To satisfy this standard, the complaint must provide "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action." *Id.* at 555. The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Essentially, "the pleading standard Rule 8

announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotations omitted).

## B.    The Telephone Consumer Protection Act

KDMC seeks damages and an injunction under the TCPA to redress the alleged harm caused by the IBEW and SEIU's robocall campaigns.  The TCPA is a federal statute that broadly regulates the use of automated telephone equipment.  Among other things, the TCPA prohibits certain unsolicited marketing calls, restricts the use of automatic dialers or prerecorded messages, and delegates rulemaking authority to the Federal Communications Commission (FCC).  Enforcement of the TCPA may occur via civil suit by state attorneys general or a private citizen.  47 U.S.C. § 227(b)(3), (g)(1).  A plaintiff who believes the TCPA was violated may file suit under § 227(b)(3), which allows a "person or entity" to sue "in an appropriate court . . . if otherwise permitted by the laws or rules of court of a State." 47 U.S.C. § 227(b)(3).  The TCPA provides for injunctive relief and statutory damages in the amount of $500.  *Id.* at (A) & (B).  Where the action is one for damages and the defendant "willfully or knowingly" violated the TCPA, the Court has discretion to award treble damages.  *Id.*

Under the TCPA, the plaintiff is not required to prove intent; the initial violation itself gives rise to liability.  Although the TCPA primarily restricts residential phone solicitations, it also prohibits prerecorded messages directed at emergency and health care facilities  as well as solicitations that tie up more than two telephone lines of a business.  47 U.S.C. § 227(1)(D).  To file suit under the TCPA a plaintiff must show that (1) one of the statute's

8

subsections was violated and (2) suit is proper under the corresponding private right-of-action provision.

Both the IBEW Defendants and SEIU seek dismissal of KDMC's TCPA claims. Premised on Rule 12(b)(1), SEIU argues this Court lacks subject matter jurisdiction because the statute's language makes clear that state courts have exclusive jurisdiction over TCPA claims. Alternatively, SEIU seeks dismissal under Rule 12(b)(6) for failure to state a claim on the basis its conduct does not fall within the ambit of the statute. The IBEW Defendants instead argue that KDMC's TCPA claims are preempted under federal labor law, arguing KDMC's TCPA claims must yield to the "exclusive remedies" set forth in Section 303 of the Labor Relations Management Act (LMRA). Section 303 of the LMRA, 29 U.S.C. § 187, expressly grants federal courts jurisdiction to redress injuries arising from secondary boycott activity defined as an unfair labor practice in Section 8(b)(4) of the National Labor Relations Act (NLRA). *Summit Valley Indus., Inc. v. Local 112, United Bhd. of Carpenters & Joiners of Am.*, 456 U.S. 717, 722 (1982). Because SEIU's 12(b)(6) argument is well-taken, it is unnecessary to delve into the morass of labor law preemption set forth in the IBEW Defendants' briefs.

### 1.    The Court Possesses Subject Matter Jurisdiction over Plaintiff's TCPA Claims

Section 227(b)(3) of the TCPA, entitled "Private right of action," provides:

A person or entity may, if otherwise permitted by the laws or rules of a court of a State, *bring in an appropriate court of that State* –

(A)    an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such a violation,

(B)    an action to recover for actual monetary loss from such a violation, or

9

to receive $500 in damages for each such violation, whichever is greater, or

(C)     both such actions.

(emphasis added).   Defendant SEIU contends this language vests state courts with *exclusive* jurisdiction over TCPA claims brought by private citizens.   While explicitly authorizing a private right of action in state court, the TCPA simply does not include a provision expressly authorizing the same in federal court.   Relying on the Sixth Circuit's decision in *Charvat v. EchoStar Satellite*, LLC, 630 F.3d 459 (6th Cir. 2010), KDMC counters that while the TCPA expressly confers jurisdiction in state courts, it does not divest federal courts of federal question jurisdiction.

Whether federal courts have federal question jurisdiction over private right of actions under the TCPA is a question that sharply divides the Circuits.[2] Six courts of appeals have held that federal district courts lack federal question jurisdiction over TCPA claims: the Second, Third, Fourth, Fifth, Ninth and Eleventh. *See Int'l Sci. & Tech. Inst., Inc. V. Inacom Commc'ns, Inc.*, 106 F.3d 1146, 1158 (4th Cir. 1997); *Chair King, Inc. V. Houston Cellular Corp.*, 131 F.3d 507, 514 (5th Cir. 1997); *Nicholson v. Hooters of Augusta, Inc.*, 136 F.3d 1287, 1289 (11th Cir. 1998); *Foxhall Realty Law Offices, Inc. v. Telecomms. Premium Servs., Ltd.*, 156 F.3d 432, 435 (2d Cir. 1998); *ErieNet, Inc. v. Velocity Net, Inc.*, 156 F.3d 513, 519 (3d Cir. 1998); *Murphey v. Lanier*, 204 F.3d 911, 915 (9th Cir. 2000).   These circuits have held the statute's explicit jurisdictional grant to bring a private right of action

---

[2]A Petition for Writ of Certiorari was filed with the Supreme Court on March 30, 2011, to resolve the following question presented: Did Congress divest the federal district courts of their federal question jurisdiction under 28 U.S.C. § 1331 over private actions brought under the TCPA? *See Mims v. Arrow Fin. Servs., LLC*, No. 10-1195, 2011 WL 1229127 (March 30, 2011).  The Supreme Court granted certiorari on June 27, 2011.  *See* 79 U.S.L.W. 3578 (U.S. June 27, 2011) (No. 10-1195).

"in an appropriate court of that State" creates exclusive jurisdiction in state courts and "effectively divests the federal courts of federal-question jurisdiction under 28 U.S.C. § 1331." *See Mims v. Arrow Fin. Servs., LLC*, No. 10-1195, 2011 WL 1229127, at *6 (March 30, 2011) (Petition for Certiorari).

The Sixth and Seventh Circuits, by contrast, have rejected the majority view that advocates exclusive state court jurisdiction. *See Charvat*, 630 F.3d at 463-64; *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 450-51 (7th Cir. 2005). Judge Sutton's departure from the majority of sister circuits in *Charvat* is grounded in textualism. He explains the TCPA's "provisions may suggest that Congress anticipated that the Act would be privately enforced in state court. But they do not establish that such claims may proceed *only* in state court." 630 F.3d at 464 (emphasis added). He draws further support from a separate subsection of the TCPA that creates exclusive jurisdiction in federal district courts over claims brought by state attorneys general, 47 U.S.C. § 227(f)(2), from which he concludes that had Congress not wanted private rights of action "to proceed in federal court, all it need[ed] to do [was] say so." *Id.* In the absence of an outright prohibition on federal question jurisdiction, the Sixth Circuit refused to imply such a restriction.

The Sixth Circuit's *Charvat* decision controls. Federal district courts possess federal question jurisdiction over private causes of action arising under the TCPA. *See APB Assocs., Inc. v. Bronco's Saloon, Inc.*, No. 10-1325, 2011 WL 2192635, at *1 (6th Cir. June 7, 2011) (relying on *Charvat*, the court reversed the district court's dismissal of TCPA claims for lack of subject matter jurisdiction); *Burdge v. Assoc. Health Care Mgmt., Inc.*, No. 1:10-CV-00100, 2011 WL 379159, at *5-6 (S.D. Ohio Feb. 2, 2011) (court denied motion

to dismiss TCPA claim to the extent it was premised on a lack of federal question jurisdiction explaining "[t]he Sixth Circuit recently determined that federal question [jurisdiction] does indeed exist over claims under the TCPA."). Defendant SEIU's motion to dismiss for lack of subject matter jurisdiction is therefore **denied** to the extent it seeks dismissal on this ground.

### 2. Plaintiff Fails to State a Claim Under the TCPA

In addition to its jurisdictional argument, SEIU insists the facts alleged in KDMC's Complaint fail to implicate the TCPA because it did not place any automated calls to Plaintiff directly and the preprogrammed dialing was not targeted to KDMC's emergency lines or patient rooms but individual residents' homes. The IBEW, in its reply, also hinted that KDMC fell short of stating a cause of action under the TCPA.[3] At oral argument, IBEW's counsel advocated that—to the extent the Court concluded SEIU's conduct fell outside the ambit of the statute based on the facts alleged—this conclusion would apply equally to its case and dismissal would be appropriate.

KDMC's TCPA claims in both cases are premised on subsections (b)(1)(A) & (D) of the statute. (IBEW Doc. # 47) (SEIU Doc. # 7). Under subsection (A) it is unlawful:

> to make any call . . . using any automatic telephone dialing system or an artificial or prerecorded voice to any emergency telephone line, including . . . any . . . emergency line of a hospital, medical physician or service office, health care facility . . . or to the telephone line of any guest room or patient room of

---

[3]In its reply brief, the IBEW Defendants raise for the first time the possibility that KDMC's Complaint fails to state a claim under the TCPA. (Doc. # 43 at 8) ("the statute prohibits making calls to emergency, guest or patient rooms of a hospital. It is undisputed that no such calls were made in this case.") (emphasis and footnotes omitted). The IBEW Defendants go on to challenge KDMC's "standing to assert the TCPA claims" given that "it was not the recipient of a single, voice recorded message call" and "the intervening actions of the Ohio residents who actually elected to connect to KDMC must be dealt with." (Doc. # 43 at 9).

a hospital, health care facility, elderly home, or similar establishment.

47 U.S.C. § 227(b)(1)(A)(I) & (ii) (internal numbering and parentheses omitted).  Subsection

(D), prohibits use of "an automatic telephone dialing system in such a way that two or more

telephone lines of a multi-line business are engaged simultaneously."  The statute defines

"automatic telephone dialing system" as:

> equipment which has the capacity –
> (A)    to store or produce telephone numbers to be called, using a random
>        or sequential number generator; and
> (B)    to dial such numbers.

47 U.S.C. § 227 (a)(1)(A) & (B).  As written, then, the TCPA redresses persons or entities

that receive calls from an automated dialing system or a prerecorded voice.

Without citing any case law directly on point, KDMC is adamant it has stated a claim

under the TCPA because it has "alleged sufficient connection between [defendants] and

the robo-calls to render [defendants] liable."  (SEIU Doc. # 7 at 4).  Although KDMC

acknowledges the robocalls were "routed" through individual callers, it characterizes this

factual distinction as a mere "technicality" that does not insulate Defendants from liability.

(Doc. # 7 at 6).   It explains "[l]iability under the TCPA may exist not only for the person

making the call, but also for the entity on whose behalf the call is made."  (SEIU Doc. # 7

at 5) (quoting *Charvat v. EchoStar Satellite*, LLC, 676 F. Supp. 2d 668, 673 (S.D. Ohio

2009)).  KDMC's attempt to analogize its circumstances to *Charvat's* entity liability analysis,

however, is unavailing.  The factual scenario presented here is simply incongruous.[4]

At issue in *Charvat* was whether the TCPA and its accompanying regulations permit recovery from an entity that did not place any illegal calls but whose independent contractors did.  In the IBEW case, Ohio AFL-CIO actually placed the calls to individual Ohio and Kentucky residents, yet it was the IBEW Defendants that directed the calls be made in the first instance.  The question the *Charvat* appellant wanted answered was whether defendants, like the IBEW, can be held liable under the TCPA for directing calls without having placed calls?  The Sixth Circuit invoked the doctrine of primary jurisdiction and referred the issue to the Federal Communications Commission.  There was no question in *Charvat* that the plaintiff received an unlawful call, the issue was simply who may be held liable.  *See also Maryland v. Universal Elections*, --- F. Supp. 2d ---, 2011 WL 2050751, at *4-5 (D. Md. 2011) (court denied defendant's motion to dismiss, concluding the plaintiff stated a claim against a corporation under §227(d) of the statute where it contracted out for robocall services to make automated calls containing political content to Maryland residents).

The cases before this Court are distinguishable from *Charvat* and *Universal Elections*.  Here, the party initiating suit never received a call from an automatic telephone dialing system or an artificial or prerecorded voice as required under the statute.  KDMC received calls from hospital goers and community members concerned about the outsourcing of local jobs and the rising cost of healthcare for KDMC employees.  Albeit at

---

[4]For one thing, defense counsel was unable to confirm at oral argument whether SEIU contracted out for robocall services, but assuming that it conducted its campaign in similar fashion to IBEW, the analogy is misapplied.  To illustrate the point, the Court draws on the scenario at issue in the IBEW Defendants' case.

IBEW and SEIU's urging, each call received was from a live caller who exercised his or her own independent judgment to connect to KDMC. SEIU insists the TCPA does not embrace this inducement to act. Based on the language of the TCPA, the Court agrees.

KDMC in its reply briefs and sur-reply continues to misconstrue the issue as one of entity liability under the TCPA, which is an issue that has yet to be decided by the courts and the FCC. Entity liability under the TCPA becomes a moot point, however, where the party initiating the action has not itself been a recipient of the unlawful conduct proscribed by statute. KDMC was not inundated with prerecorded or automated messages but with live callers who were moved to action by the union's grassroots campaign to raise awareness about issues important to its members. While the conduct complained of may have been intrusive and overbearing, the TCPA as written does not remedy such conduct. It simply does not regulate purposeful calls made by individuals seeking to express an opinion. After receiving automated calls from IBEW and SEIU, individual Ohio and Kentucky residents engaged in a decision-making process about whether to personally contact KDMC. This intervening act prevented KDMC from receiving automated calls in violation of the statute. Because KDMC was not the recipient of conduct prohibited by statute, it fails to state a cause of action under the TCPA. *See Kopff v. World Research Group, LLC*, 568 F. Supp. 2d 39, 42 (D.D.C. 2008) (plaintiff did not have standing to assert TCPA claim where she was not the direct recipient of the prohibited conduct).[5]

---

[5]As discussed during oral argument, the party with a possible right to sue in this case would be the individual recipients (i.e. Ohio and Kentucky residents) who received prerecorded messages from an automated dialing system at their homes. *See* 47 U.S.C. § 227(b)(1)(B) (it is unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party.").

Plaintiff's attempt to establish a TCPA violation under the facts alleged, takes the Court one step beyond mere entity liability. KDMC would not only have to show that Defendants IBEW and SEIU directed the robocall campaign (and, until decided by the courts or the FCC, that itself may not be redressable under the statute), it would *also* have to establish that receipt of an unlawful call under the statute may be *imputed* to a recipient that did not directly receive the prohibited call. In other words, the Court would have to find that the plain language of the statute regulates not only those entities on whose behalf calls are initiated, but also those entities that induce individuals to violate the statute. Although courts have hinted that the plain language of the statute may contemplate entity liability, the Court cannot find—and Plaintiff's have not cited—a single case standing for the proposition that the receipt of prohibited conduct may be imputed to a non-recipient.

KDMC further argues the Court must interpret the TCPA as redressing the conduct alleged here in order to avoid frustrating the policy underlying the statute. However, KDMC in its own brief articulates the statute's policy as one that seeks to prevent "businesses from being bombarded with unwanted *automated calls* which serve no legitimate purpose." (SEIU Doc. # 7 at 6) (emphasis added). KDMC did not endure a barrage of unwanted automated calls. It was forced to field calls from concerned citizens, who thought it appropriate to voice a particular viewpoint. Congress' findings prior to enactment of the TCPA demonstrate that the intended reach of the TCPA is automated or prerecorded calls Congress considers to be a nuisance or an invasion of privacy; it left for the FCC "the flexibility to design different rules" for "noncommercial calls, consistent with the free speech protection embodied in the First Amendment of the Constitution." Telephone Consumer

Protection Act, PL 102-243 (S1462), Senate Findings (December 20, 1991). The bill's proposal was a response to a drastic increase in the number of consumer complaints received by the Federal Communications Commission (FCC) in 1990 and aimed to "protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile machines and automatic dialers." S. Rep. No. 102-178, at 1968 (1991). The TCPA also sought to redress "*automated* calls . . . placed to lines reserved for emergency purposes, such as a hospitals and fire and police stations." *Id.* (emphasis added). The reach of the TCPA is narrowly confined, then, to the perils of automated and prerecorded calls. The possible "nuisance" of noncommercial calls is not protected. The TCPA is simply not the correct statutory vehicle through which KDMC may redress its claims in federal court.

KDMC has also failed to state a claim under 47 U.S.C. § 227(b)(1)(D), which prohibits "use of an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously." In its complaints, KDMC alleges that Defendant utilized "an automated telephone dialing system" that generated hundreds of calls transmitted through a robocall system "originating from a single telephone number" that "tied up multiple incoming telephone lines at KDMC's hospital facility." (SEIU Compl. ¶¶ 9, 11, 14) (IBEW Compl. ¶¶ 8, 10, 17). While the calls may have originated from the same telephone number, the fact remains that Defendants contacted individual residents of Kentucky and Ohio who were required to exercise independent judgment as to whether they wanted to take the additional step of contacting the hospital

themselves. That Defendants' automated system helped facilitate a call by individual residents to the hospital—in the event the resident *decided* he or she wanted to contact KDMC—does not place Defendants conduct within the ambit of the statute as written. The IBEW and SEIU Defendants did not direct calls to the hospital, and while there was a high probability that multiple lines at KDMC might be tied up on account of concerned citizens patching through to speak to CEO Jackson, Defendants' automated system was used to contact individual Ohio and Kentucky residents. It was not used in such a way to tie up "two or more telephone lines of a multi-line business." 47 U.S.C. § 227(b)(1)(D).

Accordingly, SEIU's motion to dismiss for failure to state a claim relative to KDMC's TCPA claims is **granted**. KDMC's TCPA claims against the IBEW Defendants are also dismissed. In its reply and at oral argument, the IBEW Defendants argued its conduct does not fall within the statute's scope. KDMC filed for leave to file a sur-reply to respond to this argument, which the Court granted.[6]

## C.    Plaintiff's CDA Claims Should be Dismissed

The IBEW Defendants seek dismissal of all claims alleged in KDMC's Complaint, including KDMC's purported "harassment" claim, which it identifies as a state law claim even though KDMC cites both the KRS and CDA as the basis for its claim.[7]    (IBEW Doc.

---

[6]While the IBEW Defendants motion is styled as a Rule 56 motion for summary judgment, the Court's ruling is more akin to a ruling on a 12(b)(6) motion to dismiss for failure to state a claim. A finding that KDMC failed to state a claim in the action against the IBEW Defendants' is appropriate based on the arguments made in the IBEW Defendants' reply (Doc. # 43) and their concession at oral argument, wherein IBEW counsel acknowledged that its primary preemption argument need not be addressed if the Court were to conclude KDMC failed to state a claim upon which relief may be granted on its TCPA claims.

[7]For the first time in their reply, the IBEW Defendants reference the CDA, arguing that KDMC's harassment claim should be dismissed because the CDA is a criminal statute that does not authorize a private right of action.

# 1).  As with every other claim in KDMC's Complaint, the IBEW Defendants argue that §

303 of the NLRA completely preempts claims related to secondary boycott activities and

because Defendants' actions constituted "peaceful secondary labor activity" the Court lacks

jurisdiction to hear a claim of harassment.  (Doc. # 40 at 14).  SEIU instead seeks dismissal

on the basis that the CDA is a criminal statute that does not provide individual plaintiffs a

private right of action.  Authority to enforce the statute lies exclusively with government

authorities, it argues.  (Doc. # 6 at 5).  SEIU's argument is well-taken,  warranting dismissal

of Plaintiff's CDA claims in both actions.

The Communications Decency Act is a criminal statute that prohibits the making of

"obscene or harassing" telecommunications.  47 U.S.C. § 223(a) ("Whoever. . . makes a

telephone call. . . without disclosing his identity and with intent to annoy, abuse, threaten,

or harass any person at the called number . . . shall be fined under Title 18 or imprisoned

not more than two years, or both.") (internal numbering omitted).  Although a criminal

statute may provide an implied right of action if Congress so intended in enacting the

criminal statute, *Thompson v. Thompson*, 484 U.S. 174, 179 (1988), such will not be the

case unless legislative intent can be inferred from the statutory language or elsewhere.  It

is well settled, however, that the CDA does not authorize a private right of action.  *Sloan*

*v. Truong*, 573 F. Supp. 2d 823, 829 (S.D.N.Y. 2008) (there is no express or implied

provision for a private remedy under § 223); *see also Osborn v. Salter*, No. 5:07CV00016,

2007 WL 1202848, at *1 (W.D. Va.  April 23, 2007) ("[T]he authority to enforce the CDA lies

with government authorities not with private citizens."); *Universal Commc'n Sys., Inc. v.*

*Lycos, Inc.*, No. 05-11172-REK, 2005 WL 5250032, at *4 (D. Mass. Dec. 21, 2005)

("Section 223 does not . . . provide a private right of action . . . so plaintiffs do not have a claim under this statute."). Where plaintiffs have initiated civil suits under this statute, courts have consistently refused to imply a private right of action. *See Croteau v. California*, No. 07-CV-588-IEG, 2007 WL 4180831, at *7 (S.D. Cal. Nov. 21, 2007) (no private right of action to recover for damages under 47 U.S.C. § 223); *Viola v. A & E Television Networks*, 433 F. Supp. 2d 613, 618 (W.D. Pa. 2006) ("[T]he authority to enforce the CDA lies with the proper government authorities and not with a private citizen such as plaintiff.").

KDMC does not address in its briefing why its CDA claims should not be dismissed and conceded its inapplicability to the case at bar at oral argument. *See e.g. Watson v. NCO Group, Inc.*, 462 F. Supp. 2d 641, 643 n.1 (E.D. Pa. 2006) (plaintiff withdrew CDA claim after conceding that 47 U.S.C. § 223 is a criminal statute that does not provide a private right of action). Precedent clearly establishes KDMC's harassment claim—as its premised on the statutory language of the CDA—is not a viable cause of action for private litigants in the civil arena. Accordingly, Count I of KDMC's Complaint in Ashland Civil #0:10-cv-83 and Count II of KDMC's Complaint in Ashland Civil #0-10-cv-131 are **dismissed**.

## D.    State Law Claims

In addition to alleging damages under both the TCPA and CDA, Plaintiff asserts a number of claims arising under Kentucky state law. However, as the Court has dismissed Plaintiff's federal statutory claims, it need not address the merits of dismissal with respect to KDMC's state-law claims. "Under 28 U.S.C. § 1367(c)(3), the district court may decline

to exercise supplemental jurisdiction over a claim if it has dismissed all claims over which it has original jurisdiction. If the federal claims are dismissed before trial, the state claims generally should be dismissed as well." *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009) (quoting *Wojnicz v. Davis*, 80 F. App'x 382, 384-85 (6th Cir. 2003)); *see, e.g., Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 210 (6th Cir. 2004); *Musson*, 89 F.3d at 11254-55 (6th Cir. 1996) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed."). Because KDMC's federal claims have been dismissed, the Court declines to exercise supplemental jurisdiction over its remaining state-law claims. *See* 28 U.S.C. § 1367(c).

### III. CONCLUSION

Accordingly, for the reasons set forth herein, **IT IS ORDERED** as follows:

(1)     The IBEW Defendants Motion for Summary Judgment (Doc. # 40) is hereby **granted**;

(2)     SEIU's Motion to Dismiss (Doc. # 6) is **granted in part and denied in part** as follows:

(a)     to the extent SEIU seeks dismissal on 12(b)(1) grounds, its motion is **denied**, and

(b)     to the extent SEIU seeks dismissal on 12(b)(6) grounds, its motion is **granted**.

(3)     The Court, in its discretion, declines jurisdiction over Plaintiff's remaining state law claims pursuant to 28 U.S.C. § 1367(c).  In Ashland Civil 10-cv-131, Plaintiff's state law claims are hereby **dismissed without prejudice** as the action was originally filed in this Court.  In Ashland Civil 10-cv-83—originally filed in Boyd Circuit Court and later removed—Plaintiff's remaining state law claims are **remanded to Boyd Circuit Court** for further proceedings consistent with this opinion; and

(4)     Both cases shall be stricken from the Court's active docket.

This 19th day of July, 2011.



Signed By:
*David L. Bunning*
United States District Judge